**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ALEX JOSEPH,                                          Case No. 1:11-cv-320

        Plaintiff,                                   Spiegel, J.
                                                     Bowman, M.J.

   v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


**REPORT AND RECOMMENDATION**

Plaintiff Alex Joseph filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled.   *See* 42 U.S.C. §405(g).   Proceeding through counsel, Plaintiff presents three claims of error.  As explained below, I conclude that the finding of non-disability should be REVERSED, because it is based upon legal error and is not supported by substantial evidence in the administrative record.

### I.  Summary of Administrative Record

In March 2006, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income Benefits (SSI), alleging a disability onset date of April 1, 2005 due to a combination of mental and physical impairments.  The record reflects that Plaintiff had been awarded a previous term of DIB for at least ten years based upon his Bipolar I disorder, but that period of disability ended, presumably due to medical improvement, in 1997.  (Tr. 18, 33, 335, 337).   After that period of disability ended, Plaintiff re-applied for benefits alleging a new disability period, but his application was denied on May 22, 2001 by an Administrative Law Judge ("ALJ") after an

evidentiary hearing.  (Tr. 41).  Following that denial, the record reflects that Plaintiff was employed, beginning in 2002, until he was hospitalized for psychiatric reasons in February of 2005.  After his hospitalization, he did not return to full-time employment with the exception of a brief period from July - October 2005.

After Plaintiff's 2006 applications were denied initially and upon reconsideration, he requested a hearing *de novo* before an ALJ.  ALJ Thomas McNichols III held evidentiary hearings on two dates in March and August 2009.  (Tr. 363-426). Represented by counsel, Plaintiff appeared and testified at both hearings.  ALJ McNichols also heard testimony from a vocational expert and from medical expert Dr. Oberlander regarding Plaintiff's mental limitations.  On September 2, 2009, ALJ McNichols issued a written decision, concluding that Plaintiff was not disabled.  (Tr. 11-26).  The Appeals Council denied Plaintiff's request for further review.  Therefore, the ALJ's decision stands as the Defendant's final determination.

The record before the ALJ reflects that Plaintiff was born in 1960, and graduated from high school.  (Tr. 79, 102).  Plaintiff had been employed as a union construction laborer (Tr. 421), and is insured for Title II benefit purposes through June 30, 2007 (Tr. 93).  While Plaintiff testified that he also suffers from hypertension, diabetes, and back pain, his primary complaint is his Bipolar Disorder.  (Tr. 216, 259, 338).

In the "Findings" representing the rationale of his decision, the ALJ determined that Plaintiff "may have performed substantial gainful activity briefly since April 1, 2005, the alleged disability onset date."  (Tr. 17).  Plaintiff initially stopped working in February 2005 when hospitalized for psychiatric symptoms.  However, the ALJ noted that treatment records reflected that Plaintiff returned to work in July 2005 for about three

months, until October 2005, when he was laid off, which in the ALJ's view "may" constitute substantial gainful activity for that period.

The ALJ found that Plaintiff suffers from two severe impairments: bipolar disorder and hypertension.  (Tr. 17).  The ALJ found that additional impairments of diabetes and back pain were not severe.  (Tr. 19).  Considering all of Plaintiff's impairments, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (*Id.*).  The ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a reduced range of medium level work, meaning that he can:

> lift up to 50 pounds occasionally and 25 pounds frequently; he must avoid climbing ropes, ladders, and scaffolds, exposure to hazards, contact with the general public, complex or detailed instructions and any requirement to maintain concentration on a single task for longer than 15 minutes at a time; and he is limited to low stress jobs with no production quotas and no over-the-shoulder supervision; simple one- or two-step tasks requiring little, if any concentration; and only limited contact with supervisors and coworkers (including no teamwork).

(Tr. 20). Ultimately, the ALJ concluded that although Plaintiff could not perform his past work, he was not under a disability, as defined in the Social Security Act, because there were jobs "that exist in significant numbers in the national economy that the claimant can perform."  (Tr. 25).  Thus, the ALJ concluded that Plaintiff was not entitled to either DIB or SSI benefits.  (Tr. 36).

On appeal to this court, Plaintiff asserts that the ALJ committed three errors: (1) by failing to find that Plaintiff's psychiatric conditions meet and/or equal the criteria of Listing 12.04(C)(2); (2) by improperly discounting Plaintiff's credibility; and (3) by relying upon an improper hypothetical to the vocational expert.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for SSI or DIB benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning,[1] a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference

---

[1] The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he or she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him or her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).  In this case, Plaintiff alleges that the three previously referenced errors require reversal.  I agree.

### B.  Specific Claims of Error

Analysis of Plaintiff's first argument, that the ALJ erred by failing to find that Plaintiff's psychiatric conditions meet and/or equal the criteria of Listing 12.04(C)(2), reveals two separate but closely related errors in this case.  First, the ALJ erred by failing to consider the appropriate regulatory criteria under Listing 12.04(C), and second, the ALJ erred by improperly rejecting the opinions of all treating and examining psychiatrists and psychologists.

### 1.  Listing 12.04

When a claimant claims disability from a mental impairment, an ALJ must rate the degree of functional limitation resulting from that impairment with respect to "four broad functional areas," including: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§404.1520a(b)(2), (c)(3).  These four areas are commonly referred to as the "B criteria."  *See Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009)(citing 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00 et seq.).

In this case, the ALJ rated Plaintiff's functional impairment in each of the four "B criteria" areas before concluding that Plaintiff did not meet or equal Listing 12.04.  The ALJ specifically found only "mild" limitations in activities of daily living, with "moderate limitations in social functioning, and in concentration, persistence or pace, but with "no episodes of decompensation" after the claimed disability onset date.  (Tr. 23-24).  However, even if a claimant does not satisfy the B criteria, he can still meet or equal Listing 12.04 if he alternatively satisfies the "C criteria" of that Listing.  The ALJ's opinion fails to discuss the C criteria at all, and does not offer any reasonable basis as to why Plaintiff did not meet or equal Listing 12.04(C).

To meet the Listing under the C criteria, the individual must demonstrate a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support.."  There is no dispute in the record presented that Plaintiff has a documented history of bipolar disorder of more than 2 years' duration that meets the first criterion of Listing 12.04(C), in terms of the disorder's "more than minimal" effect on Plaintiff's ability to perform basic work activities even on medication with psychosocial support. However, to meet Listing 12.04(C), the claimant must additionally show that he meets one of the three following prongs: "1. Repeated episodes of decompensation, each of extended duration; or 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  *Id.*

In reviewing the B Criteria, the ALJ implicitly determined that Plaintiff does not meet the first prong of the C criteria, because he found that Plaintiff's episodes of decompensation were not "repeated" after his claimed onset of disability.  On this issue, the Court finds no error.  However, the ALJ committed legal erred in failing to assess the second and third prongs of Listing 12.04(C).

Dr. Judith Freeland, as Plaintiff's treating physician, specifically opined that Plaintiff meets the second prong of the Listing 12.04(C), to the extent that even a minimal increase in mental demands or change in environment is likely to cause him to decompensate.  (Tr. 243).  At the evidentiary hearing held on August 13, 2009, medical

7

expert Dr. Oberlander agreed, testifying that Plaintiff met the criteria of Listing 12.04(C)(2). (Tr. 380). The consulting report of Dr. Malpede is consistent with a conclusion that Plaintiff meets Listing 12.04(C), in that she opined that Plaintiff had marked impairment in his ability to withstand the stress and pressure associated with day-to-day work activity and would not be employable at the time of her exam. (Tr. 216). Dr. Rosenthal's consultative opinion likewise was consistent with that Listing. Dr. Rosenthal reported that Plaintiff's ability to tolerate stress of day-to-day employment was markedly impaired at the time of his exam (Tr. 338), and that his symptoms would "significantly" increase with the stress of full-time employment. (*Id.*). The conclusion that Plaintiff meets or equals Listing 12.04(C)(2) is additionally supported by the opinion of Dr. Staskavich, two third party statements by Plaintiff's sister, and the testimony of Plaintiff himself.

In fact, virtually every mental health practitioner, whether a treating physician or an examining consultant, opined that Plaintiff's Bipolar Disorder results in mental limitations so severe that he is unemployable under Listing 12.04(C)(2) and/or Listing 12.04(C)(3).[2] In finding that Plaintiff's Bipolar Disorder does not meet or equal Listing 12.04, the ALJ discounted all five assessments of Plaintiff's mental health limitations by treating and examining medical sources, as well as testimony by Plaintiff's sister and

---

[2]Although Dr. Freeland also opined that Plaintiff met or equaled Listing 12.04(C)(3), in this appeal Plaintiff argues only that he met or equaled Listing 12.04(C)(2). Had Plaintiff not arguably waived this error, the error might well provide an alternative basis for reversal in this case. *See, e.g.*, *Pickett v. Comm'r of Social Security*, Civil Case No. 1:10-cv-528-MRB, 2011 WL 4368308 *17 (S.D. Ohio Aug. 11, 2011), R&R adopted September 19, 2011 (Listing 12.04(C) does not require institutionalized living; remanding in part to determine whether Plaintiff who was unable to function outside of home environment, where assistance was provided by family member and case manager, met or equaled Listing).

Plaintiff himself.  As explained herein, the ALJ's analysis is replete with error and requires reversal for an award of benefits.

### a.  Relevant Medical Evidence

On January 17, 2005, Plaintiff saw Judith Freeland, M.D., for an initial psychiatric evaluation.  (Tr. 256-259).  Dr. Freeland noted that Plaintiff's therapist was Joe McNamara.  Plaintiff was not oriented, and his speech was tangential.  (*Id*.).  Dr. Freeland noted Plaintiff's history of Bipolar Disorder, with a "rule out" diagnosis of Schizo-affective Disorder.  (*Id*.).  While Dr. Freeland explicitly found that Plaintiff had "improved to some extent" on his medication regimen by the time she completed her functional evaluation in 2007, she noted that he "is still very severely impaired."  (Tr. 239).

In February 2005, Plaintiff presented to the Emergency Room for evaluation. The ER physician noted that Plaintiff's thought processes were not lucid, and that his history was disorganized.  (Tr. 179).  Plaintiff's sister, who manages his medications for him, reported that Plaintiff hears voices intermittently and seemed to be "decompensated" at the time.  (Tr. 178).

Plaintiff was admitted to Fort Hamilton Hospital from February 15, 2005 through March 2, 2005 after presenting to the emergency department and indicating he had auditory hallucinations.  (Tr. 181-196).  He tested positive for marijuana (Tr. 181-182), which he had previously reported using daily. (Tr. 264).  Plaintiff had been off his medications for Bipolar Disorder over the prior year, because he believed that God had healed him of his disorder.  (Tr. 185-187).

On May 26, 2005, Plaintiff and his sister attended an individual counseling session with Mr. McNamara, M.A., who reported that Plaintiff and his sister both

believed that Plaintiff could return to work at that time.  (Tr. 247).  A subsequent progress note of June 2, 2005 reflects that Plaintiff had his license suspended due to his prescribed medications for Bipolar Disorder, and that his employer required medical clearance before permitting him to return to work.  (Tr. 201).  A note dated July 18, 2005 by Dr. Freeland reflects that Plaintiff had recently returned to work and was doing well. (Tr. 252).  However, a note by Dr. Freeland dated October 13, 2005 reflects that Plaintiff soon was laid off from work.

On June 2, 2006, Plaintiff was examined by Jayne Malpede, Ph.D., at the request of the Bureau of Disability Determination.  At that time, Plaintiff reported his attempts to work, but that he had difficulty keeping jobs over the prior five years because he would be fired or "laid off" for being late or missing work due to his inability to get out of bed and/or maintain good attendance.  (Tr. 212-213).  Plaintiff reported that when his symptoms are worse, he will wear the same clothes for days, will not shower, and will not brush his teeth unless told to do so.  (Tr. 213).

Dr. Malpede noted Plaintiff's slow speech, tangential flow of conversation, and variable eye contact.  Plaintiff had a flat affect and his mood appeared depressed and anxious.  Plaintiff's sister had to assist him in completing paperwork.  (Tr. 215).  Dr. Malpede diagnosed Bipolar I Disorder, depressed, severe without psychotic features, and assigned a then-current GAF score of 45, indicating serious symptoms.[3]  (Tr. 216). She found Plaintiff to be moderately impaired in relating to others, in understanding and

---

[3]The GAF Scale reports an individual's overall level of functioning.  "GAF scores from 41-50 indicate serious symptoms or impairments, including suicidal ideation, no friends, and inability to hold a job."  (See Doc. 11 at 3, citing DSM-IV-TR at 34).  "[T]he Commissioner 'has declined to endorse the [GAF] score for "use in the Social Security and SSI disability programs," and has indicated that [GAF] scores have no "direct correlation to the severity requirements of the mental disorders listings.'" DeBoard v. Comm'r of Soc. Sec., 211 Fed. App'x 411 (6th Cir.2006)(additional quotations omitted).

following directions. However, she opined that he was markedly impaired in his abilities to maintain attention to perform routine tasks, and in the ability to withstand the stress and pressure associated with day-to-day work activity. She did not believe Plaintiff had the mental ability to manage his own funds, or that he had the capacity for employment at the time. (*Id*.).

Late in June 2006, Patricia Semmelman (Ph.D.) undertook a records review on behalf of the agency, and determined that Plaintiff had only mild functional limitations in activities of daily living, moderate limitations maintaining social functioning, and in maintaining concentration, persistence or pace. She found he had three episodes of decompensation that occurred prior to his onset date of disability. (Tr. 219, 231). She adopted the mental RFC finding from May 2001 because Plaintiff indicated that he worked until he was "laid off" in October 2005. (Tr. 219). Dr. Semmelman also noted discrepancies in Plaintiff's statements about his marijuana use (Tr. 219). Dr. Semmelman's assessment was affirmed by Dr. Marlow in February 2007. (Tr. 237).

On July 25, 2006, Plaintiff was examined by Catherine Staskavich, Ph.D., at the request of the Butler County Department of Job and Family Services. (Tr. 314-315). Dr. Staskavich reported that Plaintiff was unable to tolerate being away from his apartment for more than a few hours. Like Dr. Malpede, she diagnosed Bipolar I Disorder and opined that Plaintiff was unemployable due to the severity of his mental impairment. In particular, Dr. Staskavich reported extreme limitations in several areas related to sustaining concentration and persistence, (Tr. 314), with marked limitations in Plaintiff's abilities to interact appropriately with the general public, ask simple questions or request assistance and accept instructions, and respond appropriately to criticism from supervisors. Dr. Staskavich additionally noted marked limitations in Plaintiff's

11

abilities to respond appropriately to changes in the work setting, or to be aware of normal hazards and take appropriate precautions. She further opined that he was extremely limited in his abilities to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. Finally, Dr. Staskavich found Plaintiff to be extremely limited in his abilities to travel to unfamiliar places, use public transportation, or set a list of goals or make plans independent of others.

On May 2, 2007, Dr. Freeland completed a Mental Impairment Questionnaire in which she indicated a diagnosis of Bipolar Disorder, with a current GAF score of 45. Dr. Freeland noted that Plaintiff is often confused and expresses religiosity, is unable to manage medications without family assistance, and is unable to meet competitive standards, given his mental abilities, to perform even unskilled work. (Tr. 241). Dr. Freeland assessed Plaintiff with extreme restrictions of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace. (Tr. 242). Dr. Freeland opined that Plaintiff was unable to function outside a highly supported living arrangement, and that even a minimal increase in mental demands or change in environment would be likely to cause him to decompensate. (Tr. 243). She also opined that Plaintiff would miss more than four days of work per month. (Tr. 244). Among the reasons provided for her opinion that Plaintiff would be unable to work were his inabilities to: sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; and respond appropriately to changes in a routine work setting. (Tr. 241). Additionally, she believed Plaintiff unable to: remember work-like procedures; understand and remember very short and simple instructions, or deal with normal work stress. (*Id*.).

Mr. McNamara, Plaintiff's therapist, also described an individual with significant mental impairments in his progress notes. (Tr. 304, 308). On April 1, 2008, Mr. McNamara also noted fine hand tremors. (Tr. 301).

Plaintiff was hospitalized for acute mental status changes from January 10, 2008 to January 12, 2008 after his Seroquel was abruptly stopped. (Tr. 284). An ER note found his blood glucose to be highly elevated, at 430, leading to a diagnosis of new onset diabetes. (Tr. 282, 285). A CT scan at the same time showed generalized brain atrophy. (Tr. 287).

After the first evidentiary hearing held in March 2009, ALJ McNichols sent Plaintiff for an additional consultative evaluation on April 30, 2009 by James Rosenthal, Psy.D. Dr. Rosenthal reported that Plaintiff was physically trembling or shaking during the exam, responded slowly to questions, and often had to have the questions repeated. (Tr. 335-336). Dr. Rosenthal found Plaintiff's abilities to sustain attention and concentration to complete daily work tasks, and to tolerate the stress of day-to-day employment, to be markedly impaired. (Tr. 338). Dr. Rosenthal additionally opined that Plaintiff's mood disorder symptoms would significantly increase with the stress of full-time employment. (*Id.*). Like Drs. Malpede and Freeman, Dr. Rosenthal assessed Plaintiff's GAF at 45, a level reflecting the inability to maintain employment.

At the August 2009 hearing, Mark Oberlander, Ph.D., testified as a medical expert. (Tr. 379-388). Dr. Oberlander opined that Plaintiff met the criteria of Listing 12.04(C)(2). (Tr. 380). He based his opinion on the twp consultative exam reports of Dr. Rosenthal and Malpede, as well as on the treating source material of Dr. Freeland. (Tr. 380-382). Stating that he was playing "devil's advocate," the ALJ questioned Dr. Oberlander as to whether Plaintiff would still be considered to be disabled if an

13

employer could provide accommodations that would encompass Plaintiff's moderate limitations with respect to following simple instructions and relating to coworkers, and marked impairments for concentration and work stress.  Dr. Oberlander stated that he would have to speculate to answer the question, and asked how long Plaintiff had been treating with Dr. Freeland.  The ALJ asked whether Dr. Freeland's extreme limitations were supported in the record (Tr. 385).  Dr. Oberlander's response to the ALJ's question is partially noted as "inaudible" in the hearing transcript.  However, the audible portion of Dr. Oberlander's response refers to the consistency of additional medical reports across the record, including a report from a 2006 consultative exam.  (Tr. 384-386).  Dr. Oberlander also explains that while he believed Plaintiff's to be a "borderline" case, he based his testimony and opinion in part on his 40 years of medical experience.  (Tr. 387).

### b.  Third Party Statements and Testimony of Plaintiff

Linda Roby, Plaintiff's sister, completed a function report on his behalf.  (Tr. 122-129).  Ms. Roby reported that she and a brother help Plaintiff manage his medications, and that she assists Plaintiff in preparing meals, shopping, and a wide variety of activities.  Ms. Roby completed a second third party function report on April 17, 2006.  (Tr. 130-137).    Other evidence in the record similarly corroborates that Plaintiff's brother and sister check in on him several times each day, ensuring that he follows a highly structured daily schedule.  (Tr. 123, 130).  With frequent monitoring, they make sure that Plaintiff showers, takes his medication, and eats.  (*Id.*).  Ms. Roby also reported to an examining psychologist that Plaintiff could not tolerate being away from his apartment for very long.  (Tr. 315).

Plaintiff testified that he had never taken public transportation and would be scared to ride a bus.  (Tr. 407).  He would not know where to put the coins or where to get off the bus.  (*Id*.).  He testified that he walks if he needs to go somewhere, that his sister does his laundry, but he can prepare simple meals using the microwave.  (*Id*.). Plaintiff testified that he has not been to see a movie because he cannot stay focused, that he enjoys singing in his church weekly (Tr. 410), but has very few other activities. On a typical day Plaintiff wakes up at 7:30 a.m., checks his blood sugar, and lays back in bed and watches television before getting up and eating breakfast.  (Tr. 412).  After breakfast he takes his medication and goes back to sleep until 11 or 11:30 a.m.  (Tr. 412-413).  He exercises by walking in a park across the street from his home, or by swimming laps at his brother's house.  (Tr. 375, 379, 413).  In the afternoon he visits his brothers or sister for about 20 minutes and then goes back home, where he prefers to stay most of the time because he gets scared when he is away from home.  (Tr. 415-416).  At the second hearing in August, Plaintiff testified that he hears sounds that overwhelm him when he goes out in public.  (Tr. 368).  He explained that he is not bothered to be around people at church because he feels safe in the house of the Lord. (Tr. 376).

## 2.  The ALJ's rejection of all treating and examining opinions

Given the overwhelming medical support that Plaintiff meets or equals Listing 12.04(C)(2), the only way in which the ALJ could find that Plaintiff did not meet or equal the referenced Listing was by discounting the opinions of each and every one of the medical sources, as well as the testimony of Plaintiff's sister and Plaintiff himself.  The only medical opinion that remotely supported the ALJ's conclusions was the opinion of a

non-examining consultant, Dr. Semmelman, but her review unduly relied upon pre-2001 records and occurred years prior to Plaintiff's most recent records.

Applicable regulations generally require the Commissioner to assign "controlling" weight to the opinions of treating physicians, and greater weight to the opinions of examining physicians than to the opinions of non-examining consultants.  For example, the regulation pertinent to evaluation of a treating physician's opinion states: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  In determining the weight to give to any medical source opinion, an ALJ must also consider: 1) the examining relationship between the medical source and claimant; 2) the treatment relationship, including the length of treatment, frequency of examination, and nature and extent of relationship; 3) support by medical evidence; 4) consistency of the opinion with the record as a whole; 5) the source's area of specialization; and 6) any other factors which support or contradict the opinion.  *Id.*

Notwithstanding the "controlling" weight usually afforded to the opinions of treating physicians, an ALJ may reject the opinions of a treating physician so long as he or she provides "good reasons" for doing so. Thus, "if the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for his rejection."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also* 20 C.F.R. § 1527(d)(2).  And regardless of medical opinions on the subject, determination of a claimant's residual functional capacity is ultimately "reserved to the Commissioner." 20 C.F.R.

§404.1527(e)(2). Where conclusions regarding a claimant's functional capacity are not substantiated by objective evidence, the ALJ is not required to credit those conclusions *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994). However, if an ALJ declines to give a treating physician's opinion controlling weight, he must then balance additional factors to determine what weight to actually give it. *See Cole v. Astrue*, 661 F.3d 931, 937-938 (6th Cir. 2011)("A finding that a treating source medical opinion...is not entitled to controlling weight [does] not [mean] that the opinion should be rejected." *Cole*, 661 F.3d at 938 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

Dr. Freeland, Plaintiff's psychiatrist, began treating Plaintiff in January 2005 and continued to treat him through the date of the evidentiary hearings in 2009. Plaintiff saw Dr. Freeland, on average, approximately four times per year for medication management. She appears to be Plaintiff's longest treating mental health source. Dr. Freeland opined in May 2007 that Plaintiff would satisfy both the B criteria and the C criteria under Listing 12.04(C). The ALJ discounted the opinions of Dr. Freeland on grounds that Dr. Freeland "did not provide any detailed, objective evidence to support her assessment," and "did not address issues of [medication] non-compliance historically that led to the episode of decompensation in February 2005 (with no episodes...since then on medication)." (Tr. 22). The ALJ noted "no evidence that she performed or ordered cognitive or other testing," and gave Dr. Freeman's opinions "no deference...because of [the] lack of detailed findings pertaining to claimant's functioning when on medications as opposed to his history when non-compliant with medication." (Tr. 22).

The record reflects that Dr. Freeland began treating Plaintiff in 2005 and immediately restarted Plaintiff on a new medication regimen, medications on which Plaintiff remained throughout the course of his treatment with Dr. Freeland. Therefore, to expect Dr. Freeland to do a "detailed" comparison of Plaintiff's functional abilities during Plaintiff's treatment with Dr. Freeland with a historical perspective of Plaintiff's functioning *prior to* the time that Plaintiff began treating with Dr. Freeland is unrealistic and does not constitute "good reasons" for discounting her opinions. Obviously, since Plaintiff was medicated throughout the period of time that he treated with Dr. Freeland, Dr. Freeland's opinions pertained to Plaintiff's functioning during that four-year treatment period.

The ALJ also rejected Dr. Freeland's opinion "because there is no objective evidence (as opposed to chronic subjective allegations to consulting sources related to his disability claim) to support her assessment." As the Sixth Circuit has noted, rejecting psychiatric evidence simply because it is based on "subjective complaints" can be problematic, since psychiatric reports "do not easily lend themselves to the same degree of substantiation as other medical impairments." *Walker v. Sec. Of Health and Human Servs.*, 980 F.2d 1066, 1071 n.3 (6th Cir. 1992). Thus, courts have found that a psychological opinion that is established "through clinical observations" or "proper psychological techniques" can suffice to demonstrate a "medically determinable" disability. *Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990). In the case presented, Dr. Freeland saw Plaintiff once every few months for medical management, in appointments that Plaintiff reported lasted about 20 minutes. Presumably Dr. Freeland did not perform extensive diagnostic testing because Plaintiff's Bipolar Disorder was well-established by history. While Dr. Freeland's clinical notes were not extensively

detailed, the length of her treatment of Plaintiff's condition spanning more than four and a half years, her expertise as his psychiatrist, and the overwhelming consistency of her opinions with the other psychiatric and psychological evidence in the record lead this Court to conclude that the ALJ erred in rejecting her opinions wholesale as "unsupported" by "objective evidence."

Indeed, two other examining sources did perform cognitive testing during the course of their clinical examinations that objectively showed the limitations of Plaintiff's functional abilities in a manner consistent with Dr. Freeland's opinions - opinions which both consulting sources validated.  For example, on June 6, 2006, Dr. Malpede performed a mental status evaluation and found Plaintiff's speech was slow and tangential at times, that he was unable to complete Serial 7s beyond 93 because he could not focus, and that he could recall 2/3 simple objects/words after fifteen minutes. (Tr. 214).  On a digit span measure, Plaintiff repeated 5 digits forward and 4 digits backward, inconsistently, demonstrating poor concentration and working memory.  (*Id.*).

The ALJ discounted the opinion of Dr. Malpede on grounds that the claimant "misled" her during the consulting examination, telling her that he had been hospitalized in February 2005 because he "'wanted to die' when there clearly was no suicidal ideation at the time per hospitalization records.'" (Tr. 20).  However, a mentally ill patient's inaccurate recall of the precise reason for a prior psychiatric admission is not, standing alone, a good reason for rejecting the entirety of Dr. Malpede's opinions.

ALJ McNichols sent Plaintiff for a consulting examination by James Rosenthal, Psy.D., after the first hearing.  Dr. Rosenthal also performed objective testing that supported significant limitations.  (Tr. 335-336).  In fact, Dr. Rosenthal's opinions were entirely in agreement with those of Drs. Freeland and Malpede.  The ALJ discounted his

opinions also on the basis that the claimant had "misled" Dr. Rosenthal by reporting that "he stopped working because of his inability to focus and distractability and stress issues" when in fact that Plaintiff had quit taking his psychiatric medications in 2005. The ALJ also rejected Dr. Rosenthal's opinions because Dr. Rosenthal noted Plaintiff's "trembling or shaking," and "appeared to associate the shaking with anxiety," (Tr. 20-21), because Plaintiff testified at the March 2009 evidentiary hearing that he had "some shaking as a side effect to medication."   Both stated reasons for discounting Dr. Rosenthal's opinions are very weak.   The first does not make sense because Dr. Rosenthal conducted a full examination, including cognitive testing, and reviewed Plaintiff's entire records which presumably included his work and medication history. Nowhere does Dr. Rosenthal suggest that his opinions of Plaintiff's functional abilities in 2009 are based upon Plaintiff's pre-medicated history of an "inability to focus" at work in 2005.   The second reason suggested by the ALJ borders on an improper role by the ALJ in assessing the cause of Plaintiff's shaking or trembling, by Plaintiff's own testimony (as opposed to a medical source) that "some" of that shaking was attributable to a medication side-effect.[4]   In any event, this relatively minor physical symptom had little to do with Dr. Rosenthal's opinions.

A third consulting psychologist, Dr. Staskavich, opined similarly to Drs. Freeland, Malpede and Rosenthal that Plaintiff's Bipolar Disorder was disabling in that it resulted in a multitude of extreme and marked limitations.   (Tr. 314-315).  The ALJ rejected her assessment because the assessment form did not list her clinical qualifications, (a Ph.D. in psychology), and because the opinion was based upon a one-time consultation

---

[4]Plaintiff's sister also reported that Plaintiff's hands shook all the time.  (Tr. 127).

that relied upon Plaintiff's subjective complaints. The Defendant Commissioner argues that because Plaintiff failed to bring Dr. Staskavich's qualifications to the attention of the ALJ prior to the decision, the Court should not consider this clarification of Dr. Staskavich's role as a medical source.[5] Even if Defendant is correct, however, it is worth noting that Dr. Staskavich's consulting examination findings are strongly aligned with the findings and conclusions of all other treating and examining mental health sources.

The opinions of all treating and examining mental health experts also were consistent with the opinion of the medical expert who testified at Plaintiff's second hearing, Dr. Oberlander. The ALJ rejected the opinion of his own medical expert on grounds that Dr. Oberlander somehow erred in relying upon the opinions of all the other mental health experts, both treating and consulting, based upon the ALJ's own analysis that those opinions overly relied upon Plaintiff's subjective complaints, and failed to adequately account for Plaintiff's successful employment prior to his alleged disability onset date, or the brief 3-month period during which Plaintiff returned to employment in 2005. The ALJ further rejected the opinion of Dr. Oberlander on grounds that the medical expert "failed to note that the claimant misled the consulting examiners" concerning the minor details noted above - none of which I have found provide a basis for rejecting those consulting opinions.

In short, not only substantial evidence but overwhelming evidence in this case supports a finding of disability. The only medical evidence in the record that provides

---

[5] The Court notes that Dr. Semmelman's credentials also do not appear to be listed, although this Court is aware from Dr. Semmelman's frequent appearance in the social security records of this Court that she is a licensed Ph.D. psychologist.

the slightest support for the ALJ's conclusions is the June 2006 opinion of non-examining consultant, Dr. Patricia Semmelman.  While not identifying her by name, the ALJ briefly discusses her opinion as that of the "BDD" (Tr. 18).  The ALJ cites the opinion as evidence supporting his decision, but this modest evidence falls short of satisfying the substantial evidence standard.  Dr. Semmelman's opinion was primarily based upon the 2001 non-disability determination and it is clear that she did not have access (in June of 2006) to more than three years' worth of records by treating and examining mental health experts who expressed a contrary view of Plaintiff's more recent level of functional impairment.  *See generally Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  Based on those records, it is clear that Plaintiff's symptoms significantly worsened, despite his medication regimen, after 2001.[6]  In rejecting virtually all of the evidence in the record (both medical evidence and the testimony of Plaintiff and third-party reports of his sister), the ALJ improperly "played doctor" by hypothesizing that since Plaintiff was able to work with Bipolar Disorder for some period of time previously, even when he was not medicated, his disease could not have worsened over time to the point that he is now disabled, despite the use of medication.  Unfortunately, the ALJ's conclusions are not supported by evidence.

### 3.  Plaintiff's Credibility

The ALJ found that Plaintiff's "statements concerning the intensity, persistence

---

[6] During the period reviewed in the 2001 opinion, Plaintiff underwent two psychiatric consulting examinations.  In stark contrast to the present record, those examinations reported no more than mild symptoms, and that Plaintiff's Bipolar Disorder was in "remission" or "partial remission."  Plaintiff's own testimony at the time was that he was not working because he had sufficient funds to get by without working.  (Tr. 35-36).  Again in contrast to the present record, just one mental health expert offered a single unsupported opinion that Plaintiff would be disabled.  Then, unlike now, the testifying medical expert agreed with the consulting opinions as well as other evidence of record that Plaintiff was not disabled by his then well-controlled Bipolar Disorder.  (Tr. 37).

and limiting effects of [his] impairments are not entirely credible."  (Tr. 24).  The ALJ based this finding primarily upon the fact that "[n]one of the mental health sources addressed the fact that the claimant had worked full-time for two to three years with the same employer leading up to the alleged onset date even though he was not [then] on any medication."  (*Id.*).  The ALJ was highly critical of Plaintiff's failure to take medication prior to his alleged disability onset date and psychiatric hospitalization in February 2005 (Tr. 17, 20, 24), but the record reflects that Plaintiff has been compliant with treatment since the alleged disability onset date.[7]  The ALJ also found no significant evidence of counseling (Tr. 19, 21), but that is contrary to the record, which reflects that Plaintiff attended counseling sessions at Comprehensive Counseling with Therapist Mr. McNamara, M.A.  (Tr. 247, 298, 301, 304, 308).  The ALJ refers to some of these visits as for the purpose of completing "paperwork," but the treatment records themselves reflect "counseling/psychotherapy."  Thus, even though courts are highly deferential to the credibility determinations, *see generally Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003), substantial evidence cannot be found to support the ALJ's negative credibility determination in this case.

Defendant points out additional small discrepancies between Plaintiff's report to one clinician that he "estimated" having been hospitalized 20 times in his life, and his report to a different clinician that he had been hospitalized 10 times.  (Tr. 212, 335). Defendant also notes a discrepancy in the record to the extent that Plaintiff reported to

_____

[7]The record consistently reflects that Plaintiff is unable to manage his own medications, and that his sister dispenses his pills in such a manner as to assist him with taking his daily prescriptions. Defendant asserts that Plaintiff "reported to Dr. Rosenthal that he took his medication independently," (Tr. 337) but that is not what record reflects.  Instead, Dr. Rosenthal's report simply states that Plaintiff "takes medicines as prescribed" - not that he able to do so "independently."

Dr. Malpede that he had used marijuana "when he was younger," whereas the record reflected a positive marijuana test just a year prior to that report.  The ALJ also noted that Plaintiff was "vague" about his marijuana use in his report to Dr. Malpede, and that he was "not convincing that he did not know why his driver's license was suspended in early 2005."  (Tr. 21).  These minor discrepancies do not provide a basis for rejecting Plaintiff's credibility as a whole, particularly since Plaintiff's mental impairment includes limitations with his memory.  (Tr. 214).

### 4.  Improper Hypothetical to Vocational Expert

Last, Plaintiff argues that the ALJ erred by failing to include the limitations offered by Dr. Freeland in the RFC assessment provided in a hypothetical question to the vocational expert.  Testimony of a vocational expert is generally used to provide substantial evidence at Step 5 of the sequential analysis, concerning the issue of whether the agency has demonstrated that a significant number of jobs exist in the national economy which the claimant can perform.  While the Court agrees that the limitations should have been included into the RFC, it is unnecessary to reach this error to the extent that the Court has determined that the Commissioner should not have advanced beyond Step 3 of the sequential analysis in this case, because Plaintiff clearly meets or equals Listing 12.04(C)(2).

### C.  Reversal for an Award of Benefits

Further fact-finding is unnecessary because the overwhelming medical and non-medical evidence in this case demonstrates that Plaintiff meets or equals Listing 12.04(C)(2) based upon the severity of his Bipolar Disorder.  The only remaining issue is to determine the onset date, for purposes of calculating Plaintiff's benefit award.  The Medical Expert testified that April 1, 2005 was a reasonable onset date, and that date is

24

supported by the record in this case. However, while the ALJ made no definitive determination, he found that Plaintiff's attempt to return to work after his psychiatric hospitalization in 2005, for a three-month period between July and October 2005, "may" amount to substantial gainful activity.

The regulations provide that jobs of short duration will not be considered past relevant work. Specifically, employment of three months or less is generally considered an unsuccessful work attempt. *See* 20 C.F.R. §404.1574(c)(3). The ALJ in this case did not inquire into the amount reflected in Plaintiff's 2005 earnings records that was earned by Plaintiff prior to his psychiatric hospitalization in February, nor did the ALJ determine what portion of Plaintiff's earnings record arose from the three month period in which he attempted to return to work. Instead, the ALJ assumed that because Plaintiff reported being "laid off" in October 2005, the termination of his employment was not related to his alleged disability. However, there is also evidence in the record that Plaintiff reported being "laid off" due to his high rate of absenteeism and inability to concentrate or focus - in other words, due to causes stemming from his Bipolar Disorder. Based on the record as a whole, I recommend that Plaintiff be awarded benefits beginning on April 1, 2005.

### III. Conclusion and Recommendation

A sentence four remand under 42 U.S.C. §405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions. *See Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). In cases where all factual issues have been resolved and remand would merely involve the presentation of cumulative evidence, remand for

an immediate award of benefits may be appropriate.  *Faucher,* 17 F.3d at 176; *see also*

*Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x. 852, 865 (6th Cir. 2011).

For the reasons explained herein, **IT IS RECOMMENDED THAT**:

1.  The decision of the Commissioner to deny Plaintiff DIB and SSI benefits be

**REVERSED** and this matter be **REMANDED** under sentence four of 42 U.S.C. §405(g)

for an immediate award of benefits consistent with this Report and Recommendation;

2.  As no further matters remain pending for the Court's review, this case be

**CLOSED.**

 /s Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALEX JOSEPH,                                                   Case No. 1:11-cv-320

        Plaintiff,                                          Spiegel, J.
                                                              Bowman, M.J.

   v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

27